IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

DENNIS K. LACOAX          )
                                  )
v.                              )      No. 1:06-0067
                                  )
MICHAEL J. ASTRUE,        )
Commissioner of Social Security[1]   )

To: The Honorable John T. Nixon, Senior District Judge

## **REPORT AND RECOMMENDATION**

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits ("DIB") under the Social Security Act ("the Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff could perform his past relevant work as a telephone salesperson during the relevant time period is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry No. 11) should be denied.

---

[1]Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of Social Security pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

1

# I. INTRODUCTION

The plaintiff filed a DIB application on September 2, 2003, alleging a disability due to a stroke, with a disability onset date of June 27, 2003. (Tr. 51, 58.) The plaintiff's application was denied initially and upon reconsideration. (Tr. 40-45.) A hearing before Administrative Law Judge ("ALJ") Peter C. Edison was held on February 14, 2005. (Tr. 317-41.) The ALJ delivered an unfavorable decision on May 2, 2005 (Tr. 19-27), and the plaintiff petitioned for review of that decision before the Appeals Council. (Tr. 14.) On July 10, 2006, the Appeals Council denied the plaintiff's request for review (Tr. 5), and the ALJ's decision became the final decision of the Commissioner.[2]

# II. BACKGROUND

The plaintiff was born on March 6, 1951, and was 52 years old as of June 27, 2003, his alleged onset date. (Tr. 54.) He completed high school (Tr. 320) and his past jobs include employment as a telephone salesperson for Home Depot, carpet installer, and house parent for the Tennessee Department of Corrections. (Tr. 221.)

---

[2] The plaintiff notes that he was approved for DIB effective May 3, 2005, the day after the ALJ's decision, thus "impliedly reupdiat[ing]" the ALJ's May 2, 2005, decision. Docket Entry No. 12, at 9-10; Docket Entry No. 12-1. The Court agrees with the Commissioner that the subsequent award of benefits is not relevant to this case.

Case 1:06-cv-00067   Document 15   Filed 02/04/10   Page 2 of 24 PageID #: 73

## A. Chronological Background: Procedural Developments and Medical Records

The plaintiff has a history of atrial fibrillation[3] (Tr. 250-62) and in June of 2001, he underwent an unsuccessful radio-frequency ablation procedure in an attempt to correct his abnormal heart beat. (Tr. 253.) On June 26, 2003, the plaintiff was taken to the Williamson Medical Center with complaints of blurred vision and slurred speech. (Tr. 100.) Dr. Frances B. Kopecky diagnosed him with having had an acute stroke but he refused to be hospitalized or take blood thinner medication or a tissue plasminogen activator ("tPA").[4] (Tr. 100-01.) On July 28, 2003, Dr. Paul McCombs examined the plaintiff and diagnosed him with atrial fibrillation. (Tr. 130.) Dr. McCombs noted the that the plaintiff had "some right sided weakness neurologically that is resolved without speech difficulty" and that he refused to take anticoagulant medication. *Id.* On September 2, 2003, Dr. McCombs determined that the plaintiff still had difficulty with his speech and memory, and he referred the plaintiff for further neuropsychological testing. (Tr. 123.)

On September 26, 2003, cardiologist Dr. Jacques Heibig conducted a treadmill stress echocardiogram on the plaintiff and found that although he had atrial fibrillation, he had no chest pain or shortness of breath. (Tr. 139.) Dr. Heibig also recommended that the plaintiff take anticoagulant medication. (Tr. 141.) On October 22, 2003, the plaintiff presented to Dr. Tom

---

[3] Atrial fibrillation is an "arrhythmia in which minute areas of the atrial myocardium are in various uncoordinated stages of depolarization and repolarization due to multiple reentry circuits within the atrial myocardium; instead of intermittently contracting, the atria quiver continuously in a chaotic pattern, causing a totally irregular, often rapid ventricular rate." Dorland's Illustrated Medical Dictionary 695 (30th ed. 2003) ("Dorland's").

[4] The American Heart Association reports that TPA is a clot busting drug that is approved for use in certain patients who are having a heart attack or stroke. American Heart Association, "Tissue Plasminogen Activator (tPA)" at http://www.americanheart.org/presenter.jhtml?identifier=4751.

3

Farmer, a family medicine physician, with complaints of left hip pain and that he was having "difficulty finding words." (Tr. 163.) Dr. Farmer noted that the plaintiff was depressed. *Id.* On November 3, 2003, Dr. Darrel Rinehart examined the plaintiff and found that the plaintiff was "suffering from depression after the death of his wife," had occasional hip and back pain, and had some difficulty with his memory. (Tr. 145.) Dr. Rinehart concluded that the plaintiff could sit, stand, or walk for six hours or more in an eight hour workday, and that he was able to lift 20 pounds intermittently in an eight hour workday. *Id.* On the same day, an x-ray of the plaintiff's chest was unremarkable and revealed that his heart and vessels were normal. (Tr. 146.)

On November 19, 2003, Dr. Farmer examined the plaintiff and found that he showed signs of depression and still had difficulty remembering certain words. (Tr. 161.) Even though the plaintiff reported that his condition was improving, Dr. Farmer prescribed Lexapro for him.[5] *Id.* On November 22, 2003, State of Tennessee Disability Determination Section ("DDS") psychologist Dr. Deborah Doineau examined the plaintiff and concluded that he had a mild cognitive disorder and was grieving the loss of his wife. (Tr. 153.) Dr. Doineau found the plaintiff's ability to concentrate and remember was mildly impaired, and that he was capable of interacting with others, using public transportation on his own, and adapting to changes in the environment. (Tr. 153.) The plaintiff also reported that he believed his condition was improving. (Tr. 154.) On November 26, 2003, neurologist Dr. Ramneet Bhullar examined the plaintiff and diagnosed the plaintiff with "likely pseudodementia secondary to possible mild depression." (Tr. 175.) Dr. Bhullar opined that even

---

[5] Lexapro is used for the treatment of major depressive disorder and general anxiety disorder. Physicians Desk Reference 1160-61 (64th ed. 2010) ("PDR").

4

though the plaintiff was alert and oriented, he had difficulty with his short term memory and attention span. *Id.* He also prescribed Lexapro for the plaintiff. *Id.*

On December 1, 2003, Dr. Edward Sachs, Ph.D., completed a mental residual functional capacity ("RFC") assessment on the plaintiff and found that the plaintiff was moderately limited in his ability "to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in the work setting." (Tr. 196-97.) Dr. Sachs noted that the plaintiff was able to "perform simple and some detailed tasks over [a] full workweek" and could adapt to "gradual or infrequent changes." (Tr. 198.)

Dr. Sachs also completed a Psychiatric Review Technique Form ("PRTF") and diagnosed the plaintiff with a cognitive disorder, not otherwise specified, and bereavement. (Tr. 182-91.) He found that the plaintiff was mildly limited in his daily living activities and in maintaining social functioning, and moderately limited in his ability to maintain concentration, persistence, or pace. (Tr. 192.) Dr. Sachs noted that the plaintiff did not have any episodes of decompensation. *Id.* He explained that although the plaintiff's psychological allegations are "partially credible," the psychological reports on the plaintiff and his activities of daily living "indicate that [he] has mild cognitive problems and views himself as more debilitated than he actually is." (Tr. 194.)

On December 17, 2003, Dr. George Bounds conducted a physical RFC on the plaintiff and opined that he could occasionally lift/carry up to twenty pounds, and frequently lift/carry up to ten pounds. (Tr. 177.) He noted that the plaintiff could stand/walk and sit for approximately six hours

in an eight hour workday and had unlimited capacity to push and pull. *Id.* Dr. Bounds further determined that the plaintiff could climb, stoop, kneel, crouch, and crawl frequently, and that he could balance occasionally. (Tr. 178.) He also found the plaintiff to have no visual, manipulative, or communicative limitations but should "avoid concentrated exposure" to extreme heat and cold. (Tr. 179-80.) Additionally, Dr. Bounds opined that the plaintiff's complaints of pain were "partially credible." (Tr. 180.)

On December 29, 2003, the plaintiff returned to Dr. Farmer and related that "words were coming better to him" but that he "still gets lost some [and] confused." (Tr. 159.) Dr. Farmer noted that the plaintiff had symptoms of depression and continued his prescription of Lexapro. *Id.* On January 21, 2004, Dr. Bhullar examined the plaintiff and opined that the plaintiff had a depressed effect but was alert and oriented. (Tr. 173.) He again concluded that the plaintiff had problems with his memory and "[p]ossible pseudomentia secondary to depression" likely caused by his wife's recent death. *Id.* Dr. Bhullar noted that even though the plaintiff reported that he "forgets a lot of things, he recollects very well the conversation we had when he last saw me in November regarding religion. This concerns me that there could be a malingering component to his memory problems." *Id.* He advised the plaintiff to take Coumadin[6] but noted that the plaintiff was resistant to taking anticoagulants. *Id.* On February 18, 2004, the plaintiff returned to Dr. Bhullar and he diagnosed the

_____

[6] According to Drugs.com, Coumadin is an anticoagulant that reduces the formation of blood clots and is used to prevent heart attacks and strokes. Drugs.com, "Coumadin" at http://www.drugs.com/coumadin.html.

6

plaintiff with memory problems and speech apraxia.[7] (Tr. 172.)  Dr. Bhullar also determined that

the plaintiff had pseudodementia and that he was not taking and refused to take his Lexapro. *Id.*

April 1, 2004, Dr. Geoffrey Berry conducted a physical RFC on the plaintiff and opined that

he could occasionally lift/carry up to fifty pounds, and frequently lift/carry up to twenty-five pounds.

(Tr. 200.)  He noted that the plaintiff could stand/walk and sit for approximately six hours in an eight

hour workday and had unlimited capacity to push and pull. *Id.*  Dr. Berry also found the plaintiff to

have no postural, manipulative, visual, or environmental limitations but opined that his ability to

speak was limited. (Tr. 201-02.)  On June 11, 2004, Dr. Farmer examined the plaintiff and diagnosed

him with joint and back pain and noted that he was easily distracted. (Tr. 237.)  Dr. Farmer also told

the plaintiff that he would be at a greater risk for a stroke if he did not take Coumadin, but the

plaintiff refused to take it. (Tr. 238.)  On July 13, 2004, Dr. Farmer diagnosed the plaintiff with a

cough and chest pain, and noted that he refused to take Coumadin or be examined by a cardiologist.

(Tr. 235-36.)

On July 15, 2004, psychologist Dr. John Alden, Ph.D., examined the plaintiff and

completed a neuropsychological report. (Tr. 270-73.) He concluded that although the plaintiff did

not have a cognitive disorder, he was experiencing cognitive difficulty due to a mood disorder.

(Tr. 270.)  Dr. Alden noted that the plaintiff "had no difficulty with articulation of speech" and that

"he may be attempting to portray himself in an unfavorable light on tests measuring his ability to

learn and retain information." (Tr. 272-73.)  Dr. Alden recommended that the plaintiff comply with

treatments for his mood disorder and learn "behavioral methods to improve memory functioning."

---

[7] Speech apraxia is a speech disorder caused by the inability to control mouth and neck
muscles. Dorland's at 120.

(Tr. 271.)  On July 27, 2004, Dr. Farmer examined the plaintiff and treated him for a rash and joint soreness. (Tr. 233.)  The plaintiff returned to Dr. Farmer on August 26, 2004, with complaints of constipation. (Tr. 232.)

On September 10, 2004, the plaintiff had right elbow arthroscopic surgery. (Tr. 284.)  On October 20, 2004, Dr. Jeffrey Adams examined the plaintiff and opined his elbow was "doing better" and that he was having less pain. (Tr. 282.)  Dr. Adams recommended that the plaintiff continue with his physical therapy. *Id.*  On the same day, Dr. Farmer completed a Medical Source Statement of Ability to Do Work-Related Activities ("Medical Source Statement") on the plaintiff and opined that he could occasionally lift/carry up to twenty-five pounds and frequently lift/carry up to ten pounds. (Tr. 241.)  He noted that the plaintiff could stand/walk for approximately six hours in an eight hour workday and had unlimited capacity to sit, push, and pull. (Tr. 242.)  Dr. Farmer limited the plaintiff's ability to balance, kneel, crouch, crawl, and stoop to "occasionally" and determined that he could "never" climb ramps, stairs, a ladder, rope, or scaffolding. *Id.*  He found that the plaintiff had no manipulative limitations but that his ability to speak and to see was limited since he was diagnosed with aphasia and wore glasses. (Tr. 243.)  Dr. Farmer determined that the plaintiff's only environmental limitation was that he should avoid heights and machinery due to his balance and heart problems. (Tr. 244.)

On October 22, 2004, Dr. Farmer examined the plaintiff and opined that he had chest pains and was sleeping only four to five hours a night. (Tr. 274.)  Dr. Farmer diagnosed the plaintiff with atrial fibrillation and aphasia. (Tr. 275.) On November 19, 2004, the plaintiff returned to Dr. Adams for a follow-up visit on his elbow surgery. (Tr. 281.)  Dr. Adams found that the plaintiff's elbow had good motion and minimal tenderness, and that his grip strength was increasing. *Id.*  Dr. Adams also

8

noted that he was going to place the plaintiff's elbow in a sleeve "just to give him some assistance when he is having to cut wood for his wood burning fireplace." *Id.*

On January 6, 2005, Dr. McCombs completed a Medical Source Statement on the plaintiff and opined that he could occasionally lift/carry up to twenty pounds, and frequently lift/carry less than ten pounds. (Tr. 276.) He noted that the plaintiff could stand/walk or sit for approximately two hours in an eight hour workday. *Id.* Dr. McCombs opined that the plaintiff could sit, stand, or walk for thirty minutes before having to change position, and that at work he needed to have the ability to "shift at will from sitting or standing/walking" and be able to "lie down at unpredictable intervals during a work shift." (Tr. 267-77.) He determined that the plaintiff's ability to twist, stoop, and crouch would "occasionally" be limited, and that his ability to climb stairs or ladders would not be limited. (Tr. 277.) Dr. McCombs noted that the plaintiff's ability to reach, handle, finger, feel, and push/pull would all be affected by the stroke-induced weakness in his right arm and leg. *Id.* He stated that the plaintiff's only environmental limitation was that he should avoid heights and machinery. (Tr. 278.) Dr. McCombs further opined that the plaintiff's stroke also impaired his ability to smile and speak clearly, and that his impairments would cause him to miss work more than three times a month. *Id.*

On March 1, 2005, Dr. Farmer completed another Medical Source Statement on the plaintiff and opined that he could occasionally and frequently lift/carry up to ten pounds. (Tr. 308.) He noted that the plaintiff was not limited in his ability to stand/walk or sit but that he needed to be able to shift positions at will while standing/walking or sitting. (Tr. 308-09.) Dr. Farmer determined that the plaintiff's ability to twist, stoop, crouch, and climb stairs and ladders would occasionally be limited, and that his ability to handle, finger, and push/pull would be affected by his past stroke.

(Tr. 309.)  He also opined that the plaintiff should avoid exposure to extreme heat, fumes, odors, dust, gasses, and poorly ventilated areas. (Tr. 310.)

In a letter from March 4, 2005, Dr. Farmer reported that the plaintiff had atrial fibrillation, lumbar disc disease, and stroke induced aphasia. (Tr. 311.)  He noted the plaintiff takes Verelan[8] to control his atrial fibrillation but does not take medication for his back pain. *Id.*  Dr. Farmer opined that the plaintiff had problems with his speech, concentration, and memory, and that he is not able to perform cognitive work "on an ongoing basis." *Id.*  Dr. Farmer also stated that the plaintiff would not be able to perform work that required him to have "good speaking skills" and that his heart condition and back problems would limit him from performing physical work. *Id.*

### B.  Hearing Testimony: The Plaintiff, the Vocational Expert, and the Plaintiff's Son and Daughter.

At the hearing before the ALJ, the plaintiff was represented by counsel, and the plaintiff, the plaintiff's son and daughter, and Karen Vessell, a Vocational Expert ("VE"), testified. (Tr. 317-341.)  The plaintiff testified that he completed high school and that he previously worked as a telephone salesperson for Home Depot and as a carpet installer. (Tr. 321.)  He explained that he could no longer work as a carpet installer because of his bad back and knees. (Tr. 323.)  The plaintiff testified that he stopped working at Home Depot on June 26, 2003, because he had a stroke. (Tr. 322.)

The plaintiff stated that when he performs physical activity his heart "goes fast and skips beats" (Tr. 324) and that his son and daughter help him with housework. (Tr. 325-26.)  He testified

---

[8] According to Drugs.com, Verelan is medication prescribed for heart and blood pressure problems that improves blood flow throughout the body, reduces blood pressure, and corrects an irregular heartbeat. Drugs.com, "Verelan PM" at http://www.drugs.com/pdr/verelan-pm.html.

10

that he has knee pain when he climbs stairs, and that after his stroke he had difficulty concentrating and remembering things. (Tr. 327, 330.) The plaintiff related that although he does not like taking pills, he does take Plavix,[9] Zoloft,[10] Mobic,[11] and Verelan. (Tr. 330.) He stated that the medications have "slowed" down his heart, but also have irritated his skin, made him feel constipated, and reduced his amount of sleep. (Tr. 330-31.) The plaintiff testified that he drives occasionally but has problems getting lost. (Tr. 332.)

The plaintiff's son, Jeremiah Lacoax, testified that since the plaintiff's stroke he has become more forgetful and easily irritated, and that he injured himself while using a chainsaw to cut wood. (Tr. 334-36.) The plaintiff's daughter, Jessica Lacoax, testified that in the weeks immediately after her father's stroke his face appeared "drawn," but that he has "improved drastically since then" and is able to "talk to you and recognize people." (Tr. 337.) She also related that the plaintiff is forgetful and that she tries to help him when she is not working. (Tr. 338.)

The VE described the plaintiff's previous jobs as a telephone salesperson as sedentary work and semi-skilled with a Specific Vocational Preparation ("SVP") level of three,[12] and as a carpet

---

[9] Plavix is medication that is prescribed to help protect against a future heart attack or stroke. PDR at 3030.

[10] Zoloft is a selective serotonin reuptake inhibitor used to treat depression, panic attacks, and social anxiety disorder. Saunders Pharmaceutical Word Book 779 (2009) ("Saunders").

[11] Mobic is a nonsteroidal anti-inflammatory drug prescribed for osteoarthritis and rheumatoid arthritis. *Id.* at 457.

[12] The SVP "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." U.S. Dep't. of Labor, Dictionary of Occupational Titles 1009 (4th ed. 1991) ("DOT"). It is measured on a scale from 1-9 on which the higher the number assigned to a job, the greater the skill that is required to perform that job. *Id.* An SVP level of three requires "[o]ver 1 month up to and including 3 months" of training to perform that specific work. *Id.*

11

installer as heavy work and semi-skilled with an SVP level of four.[13] *Id.* The VE pointed out that the DOT classified carpet installer work as medium, but she found that the carpet installer work as performed by the plaintiff should be classified as heavy work. *Id.* The ALJ asked the VE to consider whether a person with the RFC to perform a full range of light work could perform the plaintiff's past work as a telephone salesperson for Home Depot. (Tr. 338-39.) The VE responded that such a person could perform work as a telephone salesperson for Home Depot. (Tr. 339.)

The ALJ then asked the VE whether the plaintiff could perform his past work if he were physically limited to light work and could not perform jobs requiring "significant amounts of memory or concentration." *Id.* The VE answered that the plaintiff could perform work with an SVP level of one, such as an assembler, production worker, and hand packer. (Tr. 339.) The ALJ asked the VE what type of work the plaintiff could perform based upon his testimony and the ALJ answered that the plaintiff would not be able to work because his lapses in memory would "interfere with [his] completion of job tasks on a daily basis." (Tr. 339-40.)

## III.  THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on May 2, 2005. (Tr. 19-27.) Based on the record, the ALJ made the following findings:

1.      The claimant meets the nondisability requirements for a period of
        disability and disability insurance benefits set forth in Section 216(i)
        of the Social Security Act and is insured for benefits through the date
        of this decision.

---

[13] An SVP level of four requires "[o]ver 3 months up to and including 6 months" of training to perform that specific work. *Id.*

2.    The claimant has not engaged in substantial gainful activity since June 27, 2003.

3.    The claimant has the following "severe" impairments: atrial fibrillation, a cognitive disorder status post cerebrovascular accident, and a depressive disorder.

4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.    The claimants's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.    The claimant has the residual functional capacity to lift and/or carry 10 pounds frequently and 20 pounds occasionally; sit for a total of about 6 hours in an 8 hour workday; stand and/or walk for a total of about 6 hours in an 8 hour workday; occasionally climb, kneel, crouch, or crawl; frequently balance, stoop, push, pull, or reach. There are mild deficits in word finding and memory. The claimant retains the basic mental demands to understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting.

7.    The claimant is able to perform the physical and mental requirements of his past relevant work in telephone sales.

8.    The claimant is an individual closely approaching advanced age, has a high school education, and has no vocational skills that are transferable to other work.

9.    Alternatively, considering his functional capacity, age, education, and work experience, there are a significant number of jobs in the national economy that the claimant could perform; examples of such jobs are cited above.

10.   The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(f) and (g)).

(Tr. 26-27).

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot*

14

*v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that he is not engaged in "substantial gainful activity" at the time he seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)).  A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that he suffers from a "severe impairment."  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)).  Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b).  The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment in Appendix 1 of 20 C.F.R. Part 404, Subpart P of the regulations, the plaintiff is presumed disabled without further inquiry,

regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that he meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent him from doing his past relevant work, he is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, he must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that he is unable to perform his prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of his functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the plaintiff can perform,

16

he is not disabled.[14]  *Id.  See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4).  *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

## B.  The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step four of the five-step process, and ultimately determined that the plaintiff was not disabled as defined by the Act.  (Tr. 26.)  At step one, the ALJ found that the plaintiff successfully demonstrated that he had not engaged in substantial gainful activity since June 27, 2003, the alleged onset date of disability. *Id.*  At step two, the ALJ found that the plaintiff's atrial fibrillation, cognitive disorder status post cerebrovascular accident, and depressive disorder were severe impairments. *Id.*  At step three, the ALJ determined that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation 4. *Id.*  At step four, the ALJ concluded that the plaintiff was able to perform his past relevant work as a telephone salesperson. *Id.*

---

[14] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if he applied.  *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

17

The ALJ also included an alternative step five finding in his decision, concluding that even if the plaintiff could not perform his past relevant work, he could perform unskilled and light level work at SVP level one as an assembler, production inspector, and hand packer. (Tr. 25.) The effect of this decision was to preclude the plaintiff from DIB and to find him not disabled, as defined in the Act, at any time after June 27, 2003, through the date of the ALJ's decision.

### C. Plaintiff's Assertions of Error

The plaintiff contends that the ALJ failed to give proper weight to the medical opinions of the plaintiff's treating physician and erred in finding that the plaintiff could return to his past relevant work since that determination was in direct conflict with the VE's testimony. Docket Entry No. 12, at 4-11.

### 1. The ALJ properly assessed the medical evidence of the plaintiff's treating physician.

Dr. Farmer first treated the plaintiff on October 22, 2003, and diagnosed him with depression. (Tr. 163.) Over the next year and a half the plaintiff had multiple follow-up appointments with Dr. Farmer (Tr. 159, 161, 163, 233, 235-37, 242, 274) and given that regularity, he is classified as a treating source under 20 C.F.R. § 404.1502.[15] The plaintiff argues that the ALJ

---

[15] A treating source, defined by 20 C.F.R. § 404.1502, is

> your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the

erred by failing to give appropriate weight to Dr. Farmer's medical opinions since the ALJ's determination that he suffered from "only 'mild' deficits in word and memory is overwhelmingly contradicted by [Dr. Farmer]." Docket Entry No. 12, at 6-9. Specifically, the plaintiff points to Dr. Farmer's letter from March 4, 2005, in which he stated that the plaintiff had problems with his speech, concentration, and memory, and that he is not able to perform cognitive work "on an ongoing basis" or work that requires him to have "good speaking skills." Docket Entry No. 12, at 8.

Treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone." 20 C.F.R. § 404.1527(d)(2). Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

The limitations that Dr. Farmer assigned to the plaintiff in his March 4, 2005, letter were not supported by the evidence in the record. Dr. Farmer's findings were inconsistent with the findings of Dr. Doineau, Dr. Sachs, Dr. Bounds, and Dr. Alden. (Tr. 153, 172, 179, 182-91,196-98, 270-73.) Dr. Doineau, a psychologist, diagnosed the plaintiff with a mild cognitive disorder and found that

type of treatment and/or evaluation required for your medical condition(s).

19

his ability to concentrate and remember was mildly impaired. (Tr. 153.) Dr. Sachs also diagnosed the plaintiff with a mild cognitive disorder, and determined that he was mildly limited in his daily living activities and social functioning and moderately limited in his ability to concentrate. (Tr. 192.) Dr. Sachs noted that the plaintiff was able to "perform simple and some detailed tasks over [a] full workweek" and "views himself as more debilitated than he actually is." (Tr. 194, 198.) Dr. Bounds completed a physical RFC on the plaintiff and concluded that the plaintiff had no communicative limitations. (Tr. 179-80.) Dr. Alden, a psychologist, completed a neuropsychological report on the plaintiff and found that the plaintiff did not have a cognitive disorder but was experiencing cognitive difficulty due to a mood disorder. (Tr. 270.) Dr. Alden noted that the plaintiff "had no difficulty with [his] articulation of speech" and that "he may be attempting to portray himself in an unfavorable light on tests measuring his ability to learn and retain information." (Tr. 272-73.) Further, even though Dr. Farmer determined that the plaintiff's ability to speak was limited (Tr. 161, 163, 243, 275), he noted that the plaintiff's "words were coming better to him." (Tr. 159.)

Dr. Farmer's medical opinions and prescribed limitations (Tr. 311) do not align with the medical findings of Dr. Doineau, Dr. Sachs, Dr. Bounds, and Dr. Alden. (Tr. 153, 172, 179, 182-91,196-98, 270-73.) Therefore, his medical findings did not deserve controlling weight since they are not supported by the evidence in the record.

Even if a treating source's medical opinion is not given controlling weight, it is "still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R. 404.1527 . . . .*" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion

20

with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006)(quoting 20 C.F.R. § 404.1527(d)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*

The ALJ focused on the factor of supportability in discounting the severe functional limitations Dr. Farmer assigned to the plaintiff. (Tr. 24.) The ALJ stated:

> The assessments by Dr. Farmer are consistent with the ability to perform work activity at the light level of exertion. However, the statement that the [plaintiff] was unable to do work that required him to have good speaking skills is not supported by Dr. Farmer's own treatment records or the record as a whole. These records show that the [plaintiff] reported that his ability to find words and remember was improving and Dr. Farmer noted that [his] speech was clear. Dr. Alden also reported that articulation was good. At the evaluation by Dr. Alden, performance suggested that the [plaintiff] might be attempting to portray himself in an unfavorable light on tests measuring his ability to learn and retain information.

*Id.* (Internal citations omitted) The ALJ did not entirely discount Dr. Farmer's medical findings, but rather gave no weight to his assessment of the plaintiff's cognitive and speaking abilities. (Tr. 24-25.) As previously discussed, the limitations Dr. Farmer assigned to the plaintiff were inconsistent with the medical findings of Dr. Doineau, Dr. Sachs, Dr. Bounds, and Dr. Alden. (Tr. 153, 172, 179, 182-91,196-98, 270-73.) Both Dr. Doineau and Dr. Sachs diagnosed the plaintiff with only a mild cognitive disorder, and Dr. Doineau determined that his ability to concentrate was mildly impaired while Dr. Sachs concluded that his ability to concentrate was moderately impaired. (Tr. 153, 192.)

21

Dr. Alden concluded that the plaintiff did not have a cognitive disorder and attributed his cognitive difficulty to a mood disorder. (Tr. 270.)

The severity of the plaintiff's cognitive and speaking disorders is further called in to question by the observations of Dr. Bounds, Dr. Alden, Dr. Sachs, and Dr. Bhullar. Dr. Bounds reported that the plaintiff had no communicative limitations. (Tr. 179-80.) Dr. Alden found that the plaintiff "had no difficulty with [his] articulation of speech" and that "he may be attempting to portray himself in an unfavorable light on tests measuring his ability to learn and retain information." (Tr. 272-73.) Dr. Sachs stated that the plaintiff "views himself as more debilitated than he actually is" (Tr. 194), and Dr. Bhullar was concerned that there "could be a malingering component to his memory problems." (Tr. 173.) These reports of malingering behavior also undercut the legitimacy of Dr. Farmer's medical findings and prescribed limitations.

Dr. Farmer's medical findings and prescribed cognitive limitations in his March 4, 2005, letter are not supported by the record medical evidence. (Tr. 311.) The ALJ provided "good reasons," as required by Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)), for awarding minimal weight to Dr. Farmer's medical assessments and substantial evidence in the record supports that determination.

### 2. The ALJ's finding that the plaintiff could return to his past relevant work does not contradict the VE's testimony.

The plaintiff contends that the ALJ erred in stating that the VE testified that the plaintiff could perform his past relevant work as a telephone salesperson given the limitations prescribed by the ALJ. Docket Entry No. 12, at 5-6. Specifically, the ALJ found that the "[VE] testified that an individual with the limitations described above could perform the job in telephone sales." (Tr. 25)

22

The limitations that the ALJ was referring to were "mild deficits in word finding and memory." (Tr. 25.); Docket Entry No. 12, at 5. During the plaintiff's hearing, the ALJ asked the VE a hypothetical about whether the plaintiff could perform his past work as a telephone salesperson if he were able to do light work but was precluded from jobs that required "any significant amount of memory or concentration." (Tr. 339.) The VE answered that the plaintiff would not be able to perform his past job as a telephone salesperson with those limitations. *Id.* However, the ALJ concluded that the plaintiff only suffered from "*mild* deficits in word finding and memory" and his hypothetical to the VE was based upon an individual that could not perform jobs requiring a "*significant* amount of memory or concentration." (Emphasis added.) (Tr. 25, 339.)

Although the VE's testimony does not specifically address the limitations set forth in the ALJ's decision, the VE's testimony is not in conflict with the ALJ's determination that the plaintiff could perform his past work as a telephone salesperson because the ALJ found the plaintiff suffered from only "mild deficits in word finding and memory." (Tr. 25.) Given that there is substantial evidence in the record to support the ALJ's finding that the plaintiff only had mild cognitive deficiencies, the plaintiff is not precluded from performing his past work as a telephone salesperson.

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 11) be DENIED and that the Commissioner's decision be affirmed.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with

23

particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

JULIET GRIFFIN
United States Magistrate Judge